IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

REVINA WILSON,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

No. C13-0063

RULING ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

I.     INTRODUCTION .......................................... 2

II.    PROCEDURAL BACKGROUND .......................... 2

III.   PRINCIPLES OF REVIEW ............................... 2

IV.   FACTS ..................................................... 4
     A.   Wilson's Education and Employment Background ............. 4
     B.   Administrative Hearing Testimony ....................... 5
         1.   Wilson's Testimony ............................. 5
         2.   Vocational Expert's Testimony ..................... 6
     C.   Wilson's Medical History ............................ 8

V.     CONCLUSIONS OF LAW ................................. 11
     A.   ALJ's Disability Determination ......................... 11
     B.   Objections Raised By Claimant ......................... 13
         1.   Dr. Safdar's Opinions .......................... 14
         2.   Merritts' Opinions ............................ 17
         3.   Credibility Determination ........................ 19

VI.   CONCLUSION ........................................ 22

VII.  ORDER ............................................... 22

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Revina Wilson on June 24, 2013, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Wilson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Wilson requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On June 24, 2013, Wilson filed this action for judicial review. The Commissioner filed an Answer on October 29, 2013. On November 29, 2013, Wilson filed a brief arguing that there is no substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing other work that exists in significant numbers in the national economy. On January 28, 2014, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On November 7, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the

Commissioner . . . with or without remanding the cause for a rehearing."
42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported
by substantial evidence, shall be conclusive . . ." *Id*.

The Court will "affirm the Commissioner's decision if supported by substantial
evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir.
2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance
but . . . enough that a reasonable mind would find it adequate to support the conclusion.'"
*Id*. (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*,
674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable
person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the decision of the Administrative Law Judge ("ALJ")
meets this standard, the Court considers "all of the evidence that was before the ALJ, but
it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir.
2005) (citation omitted). The Court not only considers the evidence which supports the
ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v.
Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617
(8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to
find substantial evidence in support of the ALJ's decision; [the court must also] consider
evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*,
30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this
standard as follows:

> This standard is 'something less than the weight of the
> evidence and it allows for the possibility of drawing two
> inconsistent conclusions, thus it embodies a zone of choice
> within which the [Commissioner] may decide to grant or deny
> benefits without being subject to reversal on appeal.'

*Id*. (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland
v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th

Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Wilson's Education and Employment Background

Wilson was born in 1970. She completed the tenth grade in school. Later, she earned a GED. At the hearing, Wilson testified that she took some classes at community college, but was unable to complete them.

The record contains a detailed earnings report for Wilson. The report covers the time period of 1986 to 2012. Prior to 1999, Wilson had sporadic and minimal earnings (less than $375). From 1999 to 2001, she earned between $2,706.93 (1999) and $9,659.75 (2001). She had no earnings in 2002. Then, from 2003 to 2010, she earned between $1,943.01 (2004) and $14,976.91 (2009). Wilson has no earnings since 2011.

## B. *Administrative Hearing Testimony*

### 1. *Wilson's Testimony*

At the administrative hearing, the ALJ asked Wilson's attorney to summarize Wilson's case for him. Wilson's attorney explained that Wilson suffers from severe depression related to the death of her son, including psychotic features relating to a desire to "find" her son who she believes is "missing." Next, the ALJ questioned Wilson. The ALJ asked Wilson why she stopped working. Wilson responded that she stopped working because she is unable to "focus." The ALJ also inquired about Wilson's typical day:

> Q:   . . . Tell me what you did yesterday to fill your day.
> A:   I didn't do anything yesterday.
> Q:   Were you lying in bed the whole time?
> A:   Basically, yes.
> Q:   Is that what you usually do or was yesterday unusual?
> A:   What I do every day, I just sit in the bed and look out the window.
> Q:   You do anything for fun?
> A:   No.
> Q:   Is there anything you enjoy doing at all?
> A:   No.
> Q:   How many hours would you reckon you sat on your bed yesterday and looked out the window if you had to guess? I know you didn't time it, but what would your best estimate be?
> A:   All day.
> Q:   Did you accomplish anything yesterday? Did you get dressed?
> A:   No.

(Administrative Record at 44-45.)

Wilson's attorney also questioned Wilson. Wilson's attorney asked Wilson whether she received help with her daily activities. Wilson replied that her three children, ages 10 to 19, help her with her daily activities. Wilson indicated that she would have difficulty

managing on her own without the help of her children. Next, Wilson and her attorney had the following colloquy relating to the cause and severity of her depression:

> Q: Is there any consistency to anything you do? Do you have a daily plan that you try and follow?
> A: No, I just want to find my son.
> Q: What does that mean?
> A: I just want to find my son.
> Q: Where do you think he is?
> A: He's hurt somewhere.
> Q: You don't know where he is?
> A: No.
> Q: Have you taken trips to try and find him?
> A: Yes.
> Q: Where have you gone?
> A: I went to Illinois to the highway. . . .
> Q: The highway where?
> A: Where they said the accident was.
> Q: What did you expect to find?
> A: I was looking for Michael.
> Q: You understand that he's deceased?
> A: No, he's not.
> Q: He's not deceased?
> A: No.
> Q: I don't want to get you anymore upset. . . .

(Administrative Record at 50-51.) Lastly, Wilson's attorney asked Wilson about any physical problems she suffered from. Wilson stated that she has neck pain. She indicated that the pain developed following the death of her son because she generally hangs her head to the side, unable to focus or concentrate.

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Elizabeth M. Albrecht with a hypothetical for an individual who:

> doesn't have any exertional limits at all, but is able to perform only the most simple and routine and repetitive type of work.

6

This is work that doesn't require the worker to pay any close attention to detail or to use any independent judgment on the job. That's so because the work is so unchanging over time that there is no need, no requirement for the worker to judge how to respond to it. It's virtually unchanging from day to day.

Finally, I want you to assume that this worker needs an occupation where she can perform every task, every essential element of that occupation without having any contact with the general public.

(Administrative Record at 54-55.) The vocational expert testified that under such limitations, Wilson could perform the following jobs: (1) marker (2,500 positions in Iowa and 217,000 positions in the nation), (2) laundry folder (800 positions in Iowa and 88,000 positions in the nation), and (3) router (2,500 positions in Iowa and 231,000 positions in the nation). The ALJ asked the vocational expert a follow-up question:

Q:    Let me add to that collection of functional limits I've given you and ask you to assume that even after the initial training period or orientation period that one would get for these very simple and repetitive types of work, even after that if the worker required extra contact from a supervisor, let's say, 10 minutes every hour of the workday. And during these 10 minutes the supervisor would kind of reorient the worker to what's expected, refocus the worker's attention on the job task, basically just spending 10 minutes retraining the worker to do those very simple things. If a worker needed that sort of frequency and intensity of extra supervision, would you consider that that would be competitive work?

A:    If, in Hypothetical 2, for an extra 10 minutes each hour they would need to be refocused, reoriented, almost retrained on the job, like I say for the first 30 days, then maybe two weeks after that. But anything beyond that, that would preclude competitive employment.

(Administrative Record at 55-56.)

Wilson's attorney also questioned the vocational expert. Wilson's attorney inquired:

> Q: I[f] the hypothetical individual cannot maintain attention for two-hour segments, would they be competitively employable?
>
> A: No, that would preclude competitive employment.
>
> Q: If the hypothetical individual took unscheduled rest breaks in addition to the normally-scheduled rest breaks, 20-30 minutes each, 3-4 times per eight hour shift, would an employer allow for that much time away from the workplace?
>
> A: No, that type of break would not be allowed and that would preclude competitive employment.
>
> Q: If the hypothetical individual needed to work at a slow pace up to a third of the workday, would they be competitively employable?
>
> A: No, working at a slow pace up to a third of the day precludes competitive employment.

(Administrative Record at 56.)

### C. Wilson's Medical History

On December 7, 2011, following discharge from a hospital for psychiatric care, Wilson began outpatient treatment with Dr. Ali Safdar, M.D. In discussing Wilson's hospitalization, Dr. Safdar noted that Wilson "was extremely depressed and reporting some suicidal thoughts. She also was calling her son and waiting for a response. The son died in Chicago in a car accident early this month."[1] Upon examination, Dr. Safdar found that Wilson had a depressed mood and some difficulty sleeping. Dr. Safdar also noted that Wilson "still believes sometimes that her son is still around."[2] Dr. Safdar diagnosed Wilson with major depressive disorder. Dr. Safdar assigned Wilson a GAF score of 50-55. Dr. Safdar recommended medication and psychotherapy as treatment.

---

[1] Administrative Record at 335.

[2] *Id.* at 336.

8

In August 2012, Dr. Sandra Davis, Ph.D., reviewed Wilson's medical records and provided a case analysis for Disability Determination Services. Dr. Davis diagnosed Wilson with a severe affective disorder. Dr. Davis determined that Wilson had the following limitations: moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Dr. Davis opined that Wilson would be moderately limited in the ability to: carry out detailed instructions, maintain attention and concentration for extended periods of time, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation. Dr. Davis concluded that:

> In summary, [Wilson] had been noncompliant with meds for several weeks with notable problems and diminished functioning since she was in the hospital, where she did well by observation. She has now been placed on new meds and is having some secondary adjustment difficulties to them, impacting attention and concentration. On most recent psychiatrist visit, she had been feeling better, and was apparently back on her meds, but still hoped to hear from her deceased son. She would likely have had some problems handling full time employment when off her meds, . . . but given prior favorable response to meds and resumption of them recently (with adjustments), it is anticipated that with continued medication compliance she can work with some moderate work related limitations.

(Administrative Record at 109.)

On October 18, 2012, at the request of Wilson's attorney, Dr. Safdar filled out a "Mental Impairment Questionnaire" for Wilson. Dr. Safdar diagnosed Wilson with major depressive disorder with psychosis. Dr. Safdar assigned Wilson a GAF score of 45. Dr. Safdar noted that Wilson had been on medication and received counseling, but "still

exhibited significant symptomatology."[3]  Dr. Safdar described Wilson as "very depressed
and trying to find her son who died a year or more ago."[4]  Dr. Safdar identified the
following signs and symptoms for Wilson:  pervasive loss of interest in almost all
activities, decreased energy, thoughts of suicide, feelings of guilt and worthlessness, mood
disturbance, emotional withdrawal and isolation, hallucinations or delusions, illogical
thinking, and memory impairment.  Dr. Safdar determined that Wilson was unable to meet
competitive standards in the ability to:  complete a normal workday and workweek without
interruptions from psychologically based symptoms, get along with co-workers or peers
without unduly distracting them or exhibiting behavioral extremes, and set realistic goals
or make plans independently of others.  Dr. Safdar determined that Wilson had the
following limitations:  moderate restriction of activities of daily living, moderate
difficulties in maintaining social functioning, and moderate difficulties in maintaining
concentration, persistence, or pace.  Lastly, Dr. Safdar opined that Wilson would miss
four or more days from work due to her impairments or treatment for her impairments.

On October 28, 2012, at the request of Wilson's attorney, Ashley Merritts, LMFT,
Wilson's treating therapist, filled out a "Mental Impairment Questionnaire" for Wilson.
Merritts diagnosed Wilson with major depressive disorder with psychotic features.
Merritts assigned Wilson a GAF score of 30, and high GAF score for the year of 41.  In
describing Wilson's response to treatment, Merritts noted that Wilson's "[p]rogress has
varied over the course of treatment, as has [her] mental health functioning."[5]  Merritts
further noted that Wilson had been presenting with psychotic symptoms such as
hallucinations and delusions.  Merritts identified the following signs and symptoms for

---

[3] Administrative Record at 389.

[4] *Id.*

[5] Administrative Record at 398.

Wilson: decreased energy, thoughts of suicide, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, change in personality, emotional withdrawal and isolation, illogical thinking, memory impairments, and sleep disturbance. Merritts opined that Wilson was unable to meet most work standards due to memory impairment and psychomotor slowing. Merritts determined that Wilson had the following limitations: marked restriction of activities of daily living, extreme difficulties in maintaining social functioning, and extreme difficulties in maintaining concentration, persistence, or pace. Lastly, Merritts opined that Wilson would miss four or more days from work due to her impairments or treatment for her impairments.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Wilson is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not

disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

12

The ALJ applied the first step of the analysis and determined that Wilson had not engaged in substantial gainful activity since September 27, 2011. At the second step, the ALJ concluded from the medical evidence that Wilson has the following severe impairments: mood disorder with psychotic features, degenerative joint disease of the neck and shoulder. At the third step, the ALJ found that Wilson did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Wilson's RFC as follows:

> [Wilson] has the residual functional capacity to perform light work . . . except she is able to perform only simple, routine and repetitive types of work. This is work that does not require the worker to pay close attention to detail or use any independent judgment on the job, because the work is so unchanging over time that there is no need or requirement for the worker to judge how to respond, the work is virtually unchanging from day-to-day. The worker needs an occupation where she can perform every task or essential element of the occupation without having any contact with the general public.

(Administrative Record at 21.) Also at the fourth step, the ALJ determined that Wilson was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Wilson could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Wilson was not disabled.

### B. Objections Raised By Claimant

Wilson argues that the ALJ erred in three respects. First, Wilson argues that the ALJ failed to properly evaluate the opinions of Dr. Safdar, her treating psychiatrist. Second, Wilson argues that the ALJ failed to properly consider the opinions of Ashley Merritts, her treating therapist. Lastly, Wilson argues that the ALJ failed to properly evaluate her subjective allegations of disability.

## 1. Dr. Safdar's Opinions

Wilson argues that the ALJ failed to properly evaluate the opinions of her treating psychiatrist, Dr. Safdar. Specifically, Wilson argues that the ALJ's reasons for discounting Dr. Safdar's opinions are not supported by substantial evidence in the record. Wilson concludes that this matter should be remanded for further consideration of Dr. Safdar's opinions.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'*Id.*.); *Strongson v. Barnhart,* 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

14

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

In his decision, the ALJ thoroughly addressed Dr. Safdar's findings and medical conclusions.[6] In evaluating Dr. Safdar's opinions, the ALJ gave:

> little weight to [Dr. Safdar's] opinions. . . . His opinions are not supported by signs and findings consistent with the degree of limitation indicated.
>
> The doctor's findings are inconsistent with his own and other treatment notes. The doctor indicated [Wilson's] highest GAF score in the past year as 45. On December 7, 2011, the doctor assessed her GAF score as 50-55. Her GAF score was 60 in November 2011. The doctor indicates on the form [Wilson]

---

[6] *See* Administrative Record at 26 (providing thorough discussion of Dr. Safdar's medical findings).

had side effects of dizziness and upset stomach. His treatment notes for the time in question do not reflect persistent complaints as such.

The opinion relies on complete acceptance of [Wilson's] allegations concerning the existence, persistence and intensity of symptoms and functional limitations which the record as a whole and inconsistencies establish are not entitled to full credibility and are an underrepresentation of function.

The opinions are inconsistent with other evidence and inconsistencies in the record as a whole which the treating doctor did not have available. . . . The psychiatrist indicated [Wilson] had no difficulties with thinking or concentration. [Wilson] maintained her primary problem was poor concentration and focus. The psychiatrist indicated [Wilson] was not catatonic. The therapist said she was.

(Administrative Record at 27.) Furthermore, even though the ALJ gave Dr. Safdar's opinions little weight overall, the ALJ did give "some weight" to Dr. Safdar's opinion that Wilson had a "moderate degree of functional limitations concerning activities of daily living, [moderate] difficulties maintaining social functioning and [moderate] difficulties in maintaining concentration, persistence or pace" because that opinion was "more consistent with the record as a whole."[7]

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Safdar. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Safdar's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Moreover, the ALJ did not entirely reject all of Dr. Safdar's opinions, and did give some weight to

---

[7] Administrative Record at 27.

Dr. Safdar's opinions relating to Wilson's functional abilities.[8]  Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2.  *Merritts' Opinions*

Ashley Merritts, a psychological counselor, is not classified as an "acceptable medical source" under the Social Security Regulations.  Even though Merritts is not an "acceptable medical source," the Social Security Administration ("SSA") requires an ALJ to consider such opinions in making a final disability determination.  On August 9, 2006, the SSA issued Social Security Ruling 06-03p.  The purpose of Ruling 06-03p was to clarify how the SSA considers opinions from sources not classified as "acceptable medical sources."  *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p).  Ruling 06-03p provides that when considering the opinion of a source that is classified as a "not acceptable medical source," such as a counselor, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion."  SSR 06-03p.  Furthermore, in discussing SSR 06-03p, the Eighth Circuit Court of Appeals, in *Sloan*, pointed out:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment, according to SSR 06-3p.  Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the

---

[8] *See Id.*

> severity of the impairment(s) and how it affects the
> individual's ability to function.

*Sloan*, 499 F.3d at 888 (quoting SSR 06-03p). In determining the weight afforded to
"other medical evidence," an "ALJ has more discretion and is permitted to consider any
inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007,
1010 (8th Cir. 2005) (citation omitted).

    In his decision, the ALJ addressed Merritts' opinions as follows:

> The undersigned gives little weight to [Merritts'] opinions for
> reasons similar to those concerning the opinion of the treating
> psychiatrist. The therapist indicated [Wilson's] highest GAF
> score in the past year was 41, which is consistent with neither
> the psychiatrist nor other scores in the record within the prior
> year. The therapist opinions are not consistent with those of
> the treating psychiatrist. The therapist refers to extraordinary
> memory problems and psychomotor slowing. The assessment
> is inconsistent with [Wilson's] ability to drive. The ability to
> drive establishes a good ability to process visual information
> and respond appropriately and at times instantaneously.
> [Wilson] remembered names and locations of treatment with
> no evidence that she could not remember how to do the simple
> and repetitive tasks contemplated by the residual functional
> capacity assigned to her.

(Administrative Record at 27.)

    Having reviewed the entire record, the Court finds that the ALJ properly considered
Merritts' opinions in accordance with SSR 06-03p. Furthermore, the ALJ properly
articulated his reasons for attributing little weight to Merritts' opinions, and for finding her
opinions to be inconsistent with the record as a whole. *See Raney*, 396 F.3d at 1010
(Providing that in considering the opinions of a medical source that is not an "acceptable
medical source," an "ALJ has more discretion and is permitted to consider any
inconsistencies found within the record."); *see also Kirby*, 500 F.3d at 709 (providing that
an ALJ is entitled to give less weight to a medical source opinion where the opinion is

based on a claimant's subjective complaints rather than on objective medical evidence); *Sloan*, 499 F.3d at 889 (providing that a factor to consider in weighing evidence from a medical source that is not an "acceptable medical source" is the consistency of such as source's opinions with the record as a whole). Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3.    *Credibility Determination*

Wilson argues that the ALJ failed to properly evaluate her subjective allegations of disability. Wilson maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Wilson's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In his decision, the ALJ determined that:

> [Wilson] is [an] unreliable source of information regarding her functional capacity. Therefore, her allegations and her descriptions of her symptoms and functional limitations have

> not [been] given significant weight in determining her residual
> functional capacity.

(Administrative Record at 22.) In support of his conclusion, the ALJ thoroughly addressed the *Polaski* factors and found that: (1) Wilson's activities of daily living were inconsistent with her allegations of disability;[9] (2) her treatment history and medical records were inconsistent with her allegations of disability;[10] (3) when compliant with medication, her symptoms improved;[11] and (4) her lack of work history eroded her credibility.[12]

It is clear from the ALJ's decision that he thoroughly considered and discussed Wilson's treatment history, medical history, functional restrictions, effectiveness of medications, activities of daily living, and work history in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Wilson's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Wilson's subjective complaints, the Court will not disturb the ALJ's

---

[9] *See* Administrative Record at 23 (providing thorough discussion of the inconsistencies between Wilson's activities of daily living and her allegations of disability).

[10] *Id*. at 23-25 (providing thorough discussion of the inconsistencies between Wilson's medical treatment and her allegations of disability).

[11] *Id*. at 25-26, 28 (providing thorough discussion of Wilson's medication use and her improvement when using medication).

[12] *Id*. at 28 (discussing Wilson's lack of consistent work history).

21

credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## *VI. CONCLUSION*

The Court finds that the ALJ properly considered and addressed the medical evidence and opinions in the record, including the opinions of Dr. Safdar and Merritt. The Court also finds that the ALJ properly determined Wilson's credibility with regard to her subjective complaints of disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## *VII. ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

1.      The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.      Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3.      The Clerk of Court is directed to enter judgment accordingly.

DATED this _11th_ day of June, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA